UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JASON P. REED,
      Plaintiff,

vs.                                   Case No.: 4:18cv472/WS/EMT

CENTURION OF FLORIDA, LLC,
and J. FABREGAS-SCHINDLER,
      Defendants.
_____/

## **REPORT AND RECOMMENDATION**

This matter is before the court on a Motion for Summary Judgment filed by Defendants Centurion of Florida, LLC (Centurion) and Dr. J. Fabregas-Schindler (ECF No. 55), Plaintiff's response in opposition (ECF No. 58), and Defendants' reply (ECF No. 59).[1] The case was referred to the undersigned magistrate judge for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(C); *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b). Upon consideration of the record and relevant law, and for the reasons set forth below, the undersigned recommends that Defendants' motion for summary judgment be granted in part and denied in part.

---

[1] In his amended complaint (ECF No. 8), Plaintiff identifies Defendant Centurion as both "Centurion Health of Florida" and "Centurion of Florida." The proper Defendant, as reflected in Defendants' motion, is "Centurion of Florida, LLC" (*see* ECF No. 55 at 1).

I.     BACKGROUND

Plaintiff, an inmate of the Florida Department of Corrections (FDOC) proceeding pro se and in forma pauperis, filed a complaint pursuant to 42 U.S.C. § 1983 against Centurion, Dr. J. Fabregas-Schindler, L. King, and S. Bearden, alleging violations of his rights under the Eighth and Fourteenth Amendments to the United States Constitution, as well as state law, based on events that allegedly occurred while he was confined at Madison Work Camp (Madison) (ECF No. 1). Plaintiff subsequently filed an amended complaint, which is the operative pleading, alleging the same (ECF No. 8).  On March 11, 2020, the district court entered an order dismissing with prejudice Plaintiff's claims against Defendants King and Bearden, as well as Plaintiff's claims under the Fourteenth Amendment and state law (*see* ECF Nos. 41, 42).  Hence, the only claims remaining are Plaintiff's Eighth Amendment claims against Defendants Centurion and Dr. Fabregas-Schindler for deliberate indifference to a serious medical need.

II.    DISCUSSION

A. Standard of Review

To prevail on a motion for summary judgment, the moving party must show that the nonmoving party has no evidence to support his case or present affirmative evidence that the nonmoving party will be unable to prove his case at trial.  *See*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party successfully negates an essential element of the nonmoving party's case, the burden shifts to the nonmoving party to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

To defeat summary judgment, the nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Speculation or conjecture from a party cannot create a genuine issue of material fact. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). And "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004); *see also Celotex Corp.*, 477 U.S. at 324. The nonmoving party must either point to evidence in the record or present additional evidence sufficient to

withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *See Celotex Corp.*, *supra*; *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir. 1997) (Rule 56 requires the nonmoving party to go beyond the pleadings and by his or her own affidavits, or by the depositions, documents, affidavits or declarations, admissions, interrogatory answers or other materials on file designate specific facts showing that there is a genuine issue for trial); *Hammer v. Slater*, 20 F.3d 1137 (11th Cir. 1994). Moreover, "[t]he general rule is that inadmissible hearsay 'cannot be considered on a motion for summary judgment.'" *Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). As the Eleventh Circuit has recognized, "Rule 56(e) of the Federal Rules of Civil Procedure requires that 'affidavits' that support or oppose summary judgment motions 'shall be made on personal knowledge, [and] shall set forth such facts as would be admissible in evidence.'"[2] *Id.* at 1322–23.

---

[2] The undersigned notes that both Plaintiff's amended complaint (ECF No. 8) and response to Defendants' summary judgment motion (ECF No. 58) contain inadmissible hearsay, which the court cannot consider for purposes of summary judgment and thus will not address in this Report and Recommendation. In addition, Plaintiff did not sign his response to Defendants' motion. *See* N.D. Fla. Loc. R. 5.1(E) (requiring that a document filed by a pro se party include a signature block with the party's handwritten or electronic signature). Even so, the court has considered various exhibits to Plaintiff's response, including a radiology report regarding a pelvic CT scan and grievances and responses thereto (*see generally* ECF No. 58, Exhs.), some of which overlap with the exhibits submitted by Defendants (e.g., Dr. Fabregas-Schindler's interrogatory responses).

Evidence presented by the nonmoving party in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jones v. Cannon*, 174 F. 3d 1271, 1282 (11th Cir. 1999). Nonetheless, the nonmoving party still bears the burden of coming forward with sufficient evidence of every element that he or she must prove. *See Celotex Corp.*, 477 U.S. at 317. A motion for summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

B. Undisputed Material Facts

In late September 2017, while in FDOC custody, Plaintiff underwent surgery for double inguinal hernias (ECF No. 55-1 at 4–5). Dr. Osvaldo Contarini performed the surgery at the Reception and Medical Center (RMC) in Lake Butler, Florida (*id.* at 4). Once released from Dr. Contarini's care, Plaintiff was sent to the infirmary, where the provider prescribed Colace and a scrotal support for two weeks, along with Lortab, and indicated Plaintiff could engage in activity "as tolerated" (*id.* at 28). The provider's notes indicate there was to be a consult for scheduling passes for a

low bunk; no prolonged standing, pushing, pulling, or lifting; and "lay in" for five days (*id.* at 29).

Plaintiff returned to Dr. Contarini for a post-operative appointment on October 17, 2017 (ECF No. 55-1 at 34). Dr. Contarini noted Plaintiff appeared "well healed" (*id.*). Seven months later, on May 24, 2018, Plaintiff submitted a sick-call request to the medical department at Madison to renew the low bunk and restricted activity passes (*id.* at 25). The medical department received the request on May 29, and Plaintiff saw a nurse on June 1 (*id.* at 24–25). The nurse noted Plaintiff was requesting renewal of his low bunk and restricted activity passes, which were set to expire on June 13, and forwarded Plaintiff's chart to a doctor for review (*id.* at 24). A notation in Plaintiff's chart, dated June 7, 2018, states "Can't have pass — hernias repaired > 6 mo. ago" (*id.*). The accompanying signature is illegible (*id.*). Although it is not clear, for purposes of this Report and Recommendation, the undersigned assumes the signature is that of Defendant Dr. Fabregas-Schindler.

The doctor's decision apparently was not communicated to Plaintiff because Plaintiff submitted another request and saw a nurse on July 6 (*id.* at 23). The nurse informed Plaintiff that "MD" denied his request for passes on June 7 (*id*). Plaintiff "vocalized understanding" and expressed no concerns (*id.*). The next day, Plaintiff submitted an inmate request explaining his need for the low bunk pass and noting it

was based not only on the prior surgery but also on the fact that he had bilateral

carpal tunnel syndrome and an abnormally fused foot bone (*id.* at 15).  Three days

later, on July 10, Plaintiff submitted a request complaining about being assessed a

$5 co-pay without renewal of his passes (*id.* at 14).  Medical staff advised Plaintiff

that his medical records indicated he initiated a sick call visit and saw a nurse on

June 1, that the nurse referred his chart to the doctor, and that the doctor denied the

request because it had been more than six months since his hernia repair (*id.*).

Medical staff also advised Plaintiff that assessment of the co-pay was appropriate

(*id.*).

Plaintiff complained again about the co-pay in an inmate request submitted on

July 29 (*id.* at 13).  Plaintiff also complained that his requests were being ignored

"without a visit and well-fare [sic] check of surgical sight [sic]" (*id.*).  He said he

needed the passes because of "an abnormally fused bone restricting jumping up and

down from top bunk; and bi-lateral [sic] carpal tunnel restricting climbing and grip

abilities" (*id.*).  Plaintiff submitted yet another request on July 31, essentially

repeating the matters set forth in the prior requests but adding that since being on

full-duty work, he had been experiencing pain and numbness and had to spend a

weekend in bed after being required to lift fifty-pound bags of groceries and boxes

of food (*id.* at 16–18).  Plaintiff stated his passes had recently expired and he was

"still sore and the left surgical sight [sic] just closed up and still ha[d] some scab on it" (*id.* at 17).  He again mentioned that the bottom bunk pass was for an abnormally fused bone, "which restricts dropping from any distances," and bilateral carpal tunnel syndrome, "which restricts [his] grip and climbing abilities" (*id.*).  In response to the July 29 and July 31 requests, Plaintiff was advised that he had an upcoming appointment with the doctor and could address the issues then (*id.* at 13, 16).

Plaintiff saw Defendant Dr. Fabregas-Schindler on August 8, 2018 (*id.* at 22).  Dr. Fabregas-Schindler noted Plaintiff claimed he was told he could not do any work for eighteen months after his surgery (*id.*).  Dr. Fabregas-Schindler observed Plaintiff's left foot deformity and bi-lateral carpal tunnel syndrome and "cleared" Plaintiff for a low bunk pass for one year (*id.*).  Three days later, on August 11, Plaintiff submitted a sick-call request stating he was "having severe pains in [the] surgical sight [sic], getting worse every week," and that it felt like his "groind [sic] muscles [were] detaching from [his] pelvic muscles" (*id.* at 21).  He said it hurt to "even stand in [the] chow line" and that he had "sharp pain when [he] [sat] up out of bed and a little swelling also" (*id.*).  Plaintiff said he recently "went back to full blown unrestricted duties, and in last 2½ weeks pain and discomfort ha[d] increased exponentially" (*id.*).

Plaintiff saw a nurse on August 17 and said the surgical site had been "hurting for a couple of weeks" (*id.* at 20).  He complained of bilateral pain under the incision site, with the left side being the most painful (*id.*).  The nurse examined Plaintiff's surgical site and noted no apparent distress, intact skin, and minor swelling in the left inguinal area (*id.*).  The nurse forwarded Plaintiff's chart to a doctor to rule out "any adhesions/failed surgery" (*id.*).

Plaintiff says he received a "lay-in pass" on August 28 (ECF No. 8 at 9).  He says he put in a sick call and saw a male nurse to whom he "explained everything going on and pains and everything" (*id.*).  Plaintiff alleges the nurse examined him and "saw the bruising, the swelling, and the scabs" (*id.* at 9–10); no such observations, however, appear in Plaintiff's chart (*see* ECF No. 55-1 at 20).  Plaintiff alleges the nurse referred him for an MRI and to see the doctor (*see* ECF No. 8 at 10).  Plaintiff's chart indicates only that the nurse advised Plaintiff that his chart was pending review with the medical provider and that Plaintiff "verbalized understanding" (ECF No. 55-1 at 20).

Dr. Fabregas-Schindler saw Plaintiff on August 29.  Plaintiff advised that he "was lifting something & felt something rip" (*id.*).  Dr. Fabregas-Schindler examined Plaintiff and observed a palpable inguinal hernia on the left side (*id.*).  Dr. Fabregas-Schindler assessed recurrent inguinal hernia on the left side and referred Plaintiff for

surgery (*id.*).  In the surgical consultation request, Dr. Fabregas-Schindler noted

Plaintiff had been doing well since the hernia repair "until recently, when he lifted

something heavy . . . [and] felt a rip and now has excruciating pain" (*id.* at 35).  Dr.

Fabregas-Schindler indicated Plaintiff had a "defect" in the left groin and that the

"region [was] very painful on palpation" (*id.*).  She rendered a provisional diagnosis

of recurrent left inguinal hernia and requested an "urgent" surgical evaluation and

treatment recommendation (*id.*).

Later that day, Plaintiff submitted an inmate request stating he refused

medical services from RMC and any other FDOC facility "in order to pursue on [his]

own capacity upon release" (*id.* at 12).  The following day, on August 30, Plaintiff

submitted another inmate request reiterating his refusal to "pursue surgery through

F.D.O.C. channels" and stating he would "pursue surgery on [his] own capacity upon

release" (*id.* at 11).  Plaintiff submitted a third such request on September 6, in which

he alleged a failure to follow Dr. Contarini's orders regarding post-operative care

and claimed he was injured as a direct result thereof (*id.* at 10).

Despite his objections, Plaintiff was transported to RMC for a general surgery

consultation on September 11 (*id.* at 19).  The surgeon noted no complaints or

distress and found no distinct hernia; he nevertheless recommended a CT scan of

Plaintiff's pelvis and a follow-up appointment (*id.*).  Plaintiff returned to Madison

the same day, with no complaints (*id.*).  On September 17, 2018, a member of the medical staff at Madison completed a request for a CT scan (*id.*; ECF No. 58 at 20). By that time, Dr. Fabregas-Schindler no longer worked for Centurion (*see* ECF No. 55-2 at 6).

Plaintiff commenced this civil rights action shortly thereafter, on October 18, 2018 (ECF No. 1).  A CT scan conducted several months later, on January 10, 2019, revealed "small bilateral inguinal hernias right side greater than left" (ECF No. 58 at 19).

C.  Deliberate Indifference to a Serious Medical Need

Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.  *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "Federal and state governments . . . have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991).  "Medical treatment violates the Eighth Amendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations." *Id.* at 1505 (internal marks and citations omitted).

To prevail on an Eighth Amendment deprivation of medical care claim, an inmate must prove three elements. First, the plaintiff must demonstrate "an objectively serious medical need" so grave that, "if left unattended, [it] poses a substantial risk of serious harm." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (internal marks, alterations, and citations omitted). "[A] serious medical need is . . . one . . . diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal marks omitted). The second element requires "a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor*, 221 F.3d at 1258. "To show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'" *Id.* (quoting *Estelle*, 429 U.S. at 105). The official's response must have been so inadequate as to "constitute an unnecessary and wanton infliction of pain" and not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Id.* The deliberate-indifference standard is akin to "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 839–40 (1994); *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1271 (11th Cir. 2020). To satisfy the final element of an

Eighth Amendment deprivation of medical care claim, a plaintiff must show the official's deliberate indifference caused his injury. *Taylor*, 221 F.3d at 1258; *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009) (reiterating the elements of an Eighth Amendment claim).

In the prison context, the court must "distinguish between evidence of disputed facts and disputed matters of professional judgment." *Beard v. Banks*, 548 U.S. 521, 530 (2006). A medical decision not to pursue a particular course of diagnosis or treatment is a classic example of a matter for medical judgment, an exercise of which does not represent cruel and unusual punishment. *See Estelle*, 429 U.S. at 107–08. "Where a prisoner has received . . . medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." *Hamm v. Dekalb Cty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (internal marks omitted). The Eighth Amendment does not require prisoners' medical care to be "perfect, the best obtainable, or even very good." *Harris*, 941 F.2d at 1510 (internal marks omitted). Rather, as the Eleventh Circuit has emphasized, "[m]edical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* at 1505 (internal marks omitted).

Eleventh Circuit cases have given substance to *Estelle*'s distinction between "deliberate indifference" and mere negligence, setting forth categories of action or inaction that may constitute deliberate indifference.   The Eleventh Circuit has repeatedly found that an official acts with deliberate indifference when he or she knows an inmate is in serious need of medical care and fails or refuses to obtain medical treatment for the inmate.  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) (citations omitted).  "Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable."  *McElligott*, 182 F.3d at 1255; *see also Farrow*, 320 F.3d at 1246 (a defendant who delays necessary treatment for non-medical reasons may exhibit deliberate indifference); *Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) ("The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay.  A few hours' delay in receiving medical care for emergency needs such as broken bones and bleeding cuts may constitute deliberate indifference."); *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) ("[A]n unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference.").

"A private entity, like Centurion, is subject to liability under section 1983 when it 'performs a function traditionally within the exclusive prerogative of the state,' such as contracting with the county to provide medical services to inmates because it becomes 'the functional equivalent of the municipality' under section 1983 when it performs such a function." *Denham v. Centurion Health, Inc.*, 675 F. App'x 935, 940 (11th Cir. 2017) (quoting *Craig v. Floyd Cty.*, 643 F.3d 1306, 1310 (11th Cir. 2011)). However, "liability under § 1983 may not be based on the doctrine of respondeat superior." *Grech v. Clayton Cty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). In order to hold Centurion liable, therefore, Plaintiff "must prove that [Centurion] had a 'policy or custom' of deliberate indifference that led to the violation of his constitutional right." *Craig*, 643 F.3d at 1310. "Because a [corporation] rarely will have an officially-adopted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the [corporation] has a custom or practice of permitting it and that the [corporation's] custom or practice is the moving force behind the constitutional violation." *Grech*, 335 F.3d at 1330 (internal marks and alterations omitted).

D.  Centurion

    (1)    Low Bunk Passes

There clearly was a policy pursuant to which Centurion providers authorized low bunk passes for only six months following hernia surgery (ECF No. 55-2 at 5). A dispute appears to exist, however, regarding which entity promulgated the policy—the FDOC, Centurion, or both.  Although Dr. Fabregas-Schindler stated in an interrogatory response that the policy was that of the FDOC (ECF No. 55-2 at 5), other evidence of record appears to conflict with this response.  Specifically, a grievance response—supplied *by Plaintiff* in response to the motion for summary judgment—indicates that the ultimate decision maker on the matter was Dr. Fabregas-Schindler, in her capacity as the Site Medical Director at Madison and an employee of Centurion (*see* ECF No. 58 at 28) (noting that the Site Medical Director "ha[d] the final authority" as "indicated by [Dr. Fabregas Schindler's] reinstatement of [Plaintiff's low bunk] pass").[3]

Nevertheless, the disputed issue of fact does not preclude summary judgment on the issue of the low bunk pass because it would have no effect on the outcome of this action.  Plaintiff contends he needed low bunk passes (and restricted activity passes) due to the hernia surgery, bilateral carpal tunnel syndrome, and an

---

[3] Significantly, and problematically, neither Centurion nor Dr. Fabregas-Schindler submitted a copy, or any other evidence, of the alleged FDOC policy regarding low bunk passes other than Dr. Fabregas-Schindler's interrogatory response, which at least arguably is contradicted by other evidence in the record, as noted herein.

abnormally fused foot bone.  There is no indication, however, that any condition other than the hernia surgery constituted a substantial risk of serious harm.  And there is no indication that a low bunk pass would have alleviated any risk posed by the hernia surgery.  Based on the record—in particular, the fact that Plaintiff apparently re-injured himself while working without restriction—it appears that a restricted activity pass may have prevented the additional hernias, as they seem to have occurred as a direct result of heavy lifting while working, but that a low bunk pass would not have prevented the re-injury.  Thus, to the extent Plaintiff's Eighth Amendment claim turns on the failure to renew his low bunk pass upon its expiration, and any policy related to that decision, the claim fails.

(2)     Restricted Activity Passes (or "lay-in" passes)

The record is far less clear with regard to restricted activity passes, as Dr. Fabregas-Schindler did not address such passes in her interrogatory responses despite being asked about them (*see, e.g.,* ECF No. 55-2 at 5, ¶ 4 (Plaintiff's Interrogatory No. 4 asks why his "passes"—including passes relating to "jobs that [he] couldn't physically do"—were not renewed, but Dr. Fabregas-Schindler's response addresses low bunk passes only)).  And Defendants scarcely addressed restricted activity passes in their summary judgment filings.

To be sure, there is *no* evidence in the record pertaining to any policy regarding restricted activity or lay-in passes. Plaintiff contends the policies related to low bunk passes and restricted activity passes were the same, and the record appears to support his contention, considering that both passes in fact expired at or about the same time and Plaintiff sought renewal of both types of passes. Again, however, the record does not establish whether the policy (if any) was promulgated by the FDOC, Centurion, or both.[4]

Construing the facts in the light most favorable to Plaintiff, as the court is required to do, the court assumes for purposes of this Report and Recommendation that the six-month limitation applied to restricted activity or lay-in passes as well.

Given the conflicting evidence—or at least the lack of clarity—regarding policies (if any) relating to restricted activity passes, the undersigned finds that a genuine issue of material fact exists and that Centurion is not entitled to summary judgment on Plaintiff's claims, to the extent they turn on the failure to renew his restricted activity pass upon its expiration.

---

[4] It bears repeating that in her response to Plaintiff's Interrogatory No. 4, Dr. Fabregas-Schindler acknowledges that a six-month policy existed regarding low bunk passes following hernia surgery and states that the policy was that of the FDOC (ECF No. 55-2 at 5). She failed to address the issue of whether any policy existed as to restricted activity passes and thus did not identify any entity which may have implemented such a policy (*id.*).

E.  Dr. Fabregas-Schindler

As discussed above, Dr. Fabregas-Schindler's failure to renew Plaintiff's low bunk pass upon its expiration does not appear to have contributed to his work injury, and thus summary judgment is appropriate on any Eighth Amendment claim relating to this failure. However, assuming the same six-month limitation applied to restricted activity passes—as the court must—a material fact in dispute exists regarding whether Dr. Fabregas-Schindler acted with deliberate indifference in following such a policy, as opposed to exercising her independent medical judgment, in refusing to renew Plaintiff's restricted activity pass prior to his work injury. Hence, summary judgment in her favor is unwarranted on this claim.

III.    CONCLUSION

Viewing the evidence in the light most favorable to Plaintiff, as the court must, the undersigned finds that a genuine issue of material fact exists with respect to Plaintiff's claims against both Centurion and Dr. Fabregas-Schindler regarding restricted activity passes and that Defendants' motion, therefore, should be granted only in part.

Accordingly, it is respectfully **RECOMMENDED** that Defendants Centurion of Florida, LLC, and Dr. J. Fabregas-Schindler's Motion for Summary Judgment (ECF No. 55) be **GRANTED in part** and **DENIED in part**, as follows:

1.      That Defendants' Motion for Summary Judgment be **GRANTED** as to Plaintiff's Eighth Amendment claims based on the policy regarding low bunk passes and Dr. Fabregas-Schindler's failure to renew Plaintiff's low bunk pass upon its expiration.

2.      That Defendants' Motion for Summary Judgment be **DENIED** as to Plaintiff's Eighth Amendment claims based on Centurion's alleged policy regarding restricted activity passes and Dr. Fabregas-Schindler's failure to renew Plaintiff's restricted activity pass upon its expiration.

3.      That the matter be referred back to the Magistrate Judge for further proceedings on the remaining claims.

At Pensacola, Florida this 8th day of February 2021.


*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>.  An objecting party must serve a copy of the objections on all other parties.  A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**